UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

ALEA LONDON, LIMITED,

      Petitioner,

vs.                     CASE NO.  CIV. 6:06-cv-1683-ORL-31DAB

SEA GARDEN HOSPITALITY
MANAGEMENT, INC., et. al.,

      Respondents.

_____/

## DEFENDANT, SEA GARDEN HOSPITALITY MANAGEMENT, INC.'S RESPONSE TO PLAINTIFF, ALEA LONDON, LIMITED'S MOTION FOR SUMMARY JUDGMENT

COMES NOW, Defendant, SEA GARDEN HOSPITALITY MANAGEMENT, INC. (hereinafter "SEA GARDEN") by and through its undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local Rule 3.01 files this its Response to Plaintiff, ALEA LONDON, LIMITED'S (hereinafter "ALEA") Motion for Summary Judgment.

## I.    BACKGROUND

The Seagarden Inn is a beachside hotel located at 3161 South Atlantic Avenue in Daytona Beach, Florida.  SEA GARDEN owned this hotel until December 16, 2005, when both the real property and business were sold to Bray & Gillespie. (See ALEA'S Motion, Exhibit "C").  Prior to the sale LOUIS and ELIZABETH BROWN; NORMA and BOBBIE BROWN; and ANITA COMEAU and JACQUES LONGTIN had checked into the hotel.(Deposition of Anita Comeau, p. 32 l.25; p.33, l.1); (Deposition of NORMA BROWN, p.56, l.17-18);  (Deposition of Louis Brown, p. 32 l.25; p.33, l.1).  All remained as guests through and after the sale.

In early January 2006 LOUIS BROWN (January 6, 2006), ANITA COMEAU (January 7, 2006), and NORMA BROWN (January 6, 2006) began experiencing symptoms of an

influenza/pneumonia type illness for which they sought medical treatment. Ultimately, their illnesses resulted in the Volusia County Health Department becoming involved and issuing a report entitled Outbreak of Legionaire's Disease in Hotel in Volusia County, Florida. It is notable that the Health Department did not find evidence of legionella bacteria at the hotel.

Ultimately, the above facts resulted in litigation. Specifically, three lawsuits, exclusive of this coverage litigation, which concern the BROWN, COMEAU and BROWN illnesses are currently pending before this court.[1] All three of the Amended Complaints allege that the negligence of SEA GARDEN and Bray & Gillespie caused BROWN, COMEAU and BROWN to be exposed to legionella at the hotel and thereafter develop Legionnaire's disease. All three Amended Complaints also contain counts for breach of contract premised on the theory that SEA GARDEN and Bray & Gillespie failed to provide a reasonably safe premises due to the presence of legionella. (See ALEA'S Motion, Exhibit "B").

Prior to the December 16, 2005, sale, ALEA had issued to SEA GARDEN a policy of liability insurance with a policy period was 12-27-04 to 12-27-05. The policy (Policy No. BU05020) is comprised of a 16 page ISO Commercial General Liability Coverage Form (CG00 01 10 01) with a number of endorsements added thereto. The first endorsement is the ALEA 01 Endorsement which is some seven pages in length. The sixth endorsement is the ALEA 2340 "Land, Water, and Air Exclusion."

Section I of the ISO CGL Form concerns coverages for "bodily injury and property damage liability." Paragraph 2 of that Section contains the exclusions and subparagraph f is an exclusion for pollution. It reads, in pertinent part:

---

[1] The following matters are currently pending in the Middle District of Florida: Norma E. Brown and Bobbie Brown vs. Sea Garden Hospitality, etc.,6:06-cv-660-ORL-22JGG; Louis Brown and Elizabeth Brown vs. Sea Garden Hospitality, etc., 6:06-cv-661-ORL-22JGG; Anita Comeau and Jacques Longtin v. Sea Garden Hospitality, etc., 6:06-cv-891-ORL-18JGG.

**f.     Pollution**

    (1)    "Bodily Injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":

        (a)    At or from any premises, site or location which is or was at any time owned or occupied or rented or loaned to, any insured

*   *   *

    (2)    Any loss, cost or expense arising out of any:

        (a)    Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, "pollutants", or

        (b)    Claim or "suit" by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, "pollutants".

(See Exhibit "A" to ALEA'S Motion, CG 00 01 10 01, p. 3 of 16).   The ALEA 01 Endorsement

contains a pollution exclusion which reads as follows:

**ABSOLUTE POLLUTION EXCLUSION**

Under 2., Exclusions, f. Pollution, Commercial General Liability Form, Section I.-Coverages, Pollution/environmental impairment/contamination is not covered under this policy nor any obligation to share any damages with or repay anyone else who must pay damages from same in conjunction with occurrences arising or alleged to have arisen out of same. All liability and expense arising out of or related to any form of pollution, whether intentional or otherwise and whether or not any resulting injury, damage, devaluation, cost or expense is expected by any Insured or any other person or entity is excluded through out this policy. **All wording is replaced by the following:**

    (A)    "Bodily Injury," "Personal Injury," "Property Damage," or Damages for the devaluation of property, or for taking, use or acquisition or interference with the rights of others in or on property or air space, or any other type injury or expense; or

    (B)    Any loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, governmental authority or directive or that of any private party or citizen action that any Insured, or others, test for, monitor, clean up, remove, contain, treat, detoxify, or neutralize or in anyway respond to or assess same the effects of pollutants, environmental impairments or contaminants or (2) any litigation or administrative procedure in which any Insured or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape, or placement of pollutants, environmental impairments or contaminants into or upon land, premises, buildings, the atmosphere, any water course, body

> of water, aquifer or ground water, whether sudden, accidental or gradual in
> nature or not, and regardless of when.

Pollutants means any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, electrical, or
magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes,
fiber, radiation, alkais, pertroleums, chemicals or waste. Waste includes medical waste and
all other materials to be disposed of, recycled, stored, reconditioned, or reclaimed

(Emphasis supplied). In essence, ALEA'S policy strikes the ISO CGL form pollution exclusion and

replaces it with (A) and (B) in the ALEA 01 Endorsement's pollution exclusion. ("All wording is

replaced by the following").

The policy also contains the ALEA 2340 "Land, Air and Water Exclusion" which reads as

follows:

### SEEPAGE AND/OR POLLUTION AND/OR CONTAMINATION EXCLUSION

Notwithstanding any provision to the contrary within the Policy of which this Endorsement
forms part (or withing any other Endorsement which forms this Policy), this Policy does not
insure:

    (a)    any loss, damage, cost or expense, or

    (b)    any increase in insured loss, damage, cost or expense, or

    ( c)    any loss, damage, cost, expense, fine or penalty, which is incurred,
sustained or imposed by order, direction instruction or request of, or by any
agreement with, any court, government agency or many public, civil or
military authority, or threat thereof (and whether or not as a result of public
or private litigation),

which arises from any kind of seepage or any kind of pollution and/or contamination, or
threat thereof, whether or not caused by or resulting from a peril insured, or from steps or
measures taken in connection with the avoidance, prevention, abatement, mitigation,
remediation, clean-up or removal of such seepage or pollution and/or contamination or
threat thereof.

The term "any kind of seepage or any kind of pollution and/or contamination" as used in this
Endorsement includes (but is not limited to):

    (a)    seepage of, or pollution and/or contamination by, anything, including but
not limited to, any material designated as a "hazardous substance" by the
United States Environmental Protection Agency or as a "hazardous
material" by the United States Department of Transportation, or defined as
a "toxic substance" by the Canadian Environmental Protection Act for the
purposes of Part II of that Act, or any substance designated or defined as
toxic, dangerous, hazardous or deleterious to persons or the environment
under any other Federal, State, Municipal or other law, ordinances or

regulations; and

(b)     the presence, existence, or release of anything which endangers or threatens to endanger the health, safety or welfare of persons or the environment.

(See Exhibit "A" to ALEA'S Motion).

SEA GARDEN requested that its insurer, ALEA, defend and indemnify the aforementioned

tort actions.  ALEA is defending SEA GARDEN in the tort actions under Reservation of Rights and

it has filed the subject Declaratory Judgment Action seeking to disclaim its duty to defend and/or

indemnify SEA GARDEN.

ALEA has now moved for summary judgment on its Declaratory Judgment Action.  ALEA's

Motion for Summary Judgment appears to raise four arguments:

1)     That the Absolute Pollution Exclusion relieves it of its duty to defend and indemnify SEA GARDEN as to the tort suits;

2)     That the Absorption/Inhalation/Disease Exclusion relieves it of its duty to defend and indemnify SEA GARDEN as to the tort suits;

3)     That the Seepage and/or Pollution and/or Contamination Exclusion in the "Sea, Land, and Air" exclusion endorsement relieves it of its duty to defend and indemnify SEA GARDEN as to the tort suits; and

4)     That because of the timing of the sale of the hotel to Bray & Gillespie vis-a-vis the timing of the tort plaintiffs developing symptoms of illness SEA GARDEN did not have an insurable interest in the property.

Each argument is addressed below.  For purposes of making the arguments flow better ALEA'S

arguments (2) and (4), as numbered above, are addressed first.

## II.    ARGUMENT AND MEMORANDUM OF LAW

### A.    Summary Judgment

The Middle District of Florida has stated as follows:

Pursuant to Federal Rule of Civil Procedure 56( c), the entry of summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  In applying this standard the Court must examine the pleadings, depositions, answers to interrogatories, and admissions on file together with any affidavits and other evidence in the record "in the light

most favorable to the nonmoving party" As the Supreme Court held in <u>Celotex Corp. V. Catrett</u>, the moving party bears the initial burden of establishing the nonexistence of a triable issue of fact. If the movant is successful on this score, the burden of production shifts to the non-moving party, who must then come forward with "sufficient evidence of every element that he or she must prove." The non-moving party may not simply rest on the pleadings, but must use affidavits, depositions or answers to interrogatories, or other admissible evidence to demonstrate that a material fact issue remains to be tried.

<u>Travelers Indemnity Co. of Illinois v. Royal Oak Enterprises, Inc.</u>, 344 F. Supp.2d 1358, 1364-1365 (M.D. Fla. 2004) (internal citations omitted).

## B.    General Principles of Florida Insurance Law

Florida Courts have consistently held that "insurance contracts must be construed in accordance with the plain language of the policy." <u>Swire Pacific Holdings, Inc. v. Zurich Ins. Co.</u>, 845 So.2d 161, 165 (Fla. 2003) (internal citations omitted). "If the relevant policy language is susceptible to more then one reasonable interpretation, one providing coverage and the [other] limiting coverage, the insurance policy is considered ambiguous." <u>Swire</u>, 845 So.2d at 165. Ambiguities in an insurance policy are to be construed against the drafter. Specifically, "[e]xclusionary provisions which are ambiguous or otherwise susceptible to more than one meaning must be construed in favor of the insured, since it is the insurer who usually drafts the policy." <u>Id.</u> (Internal quotation omitted). There is a 'clear mandate in Florida law to construct a contract of insurance in favor of the insured and strictly against the drafter." <u>Cast Steel Products, Inc. v. Admiral Ins. Co.</u>, 348 F.3d 1298, 1304 (11th Cir. 2003); cert. denied, 541 U.S. 1072 (2004).

## C.    Duty to Defend and Indemnify

"[A]n insurer's duty to defend is broader than its duty to indemnify" <u>United States Fire Ins. Co. v. Hayden Bonded Storage Co.</u>, 930 So.2d 686, 691 (Fla. 4th DCA 2006). The existence of the duty to defend is based only on the allegations of the tort complaint(s). <u>Hayden</u>, 930 So.2d at 691.

> [A]n insurer's duty to defend arises when a complaint filed against an insured alleges facts within the scope of the policy's coverage. Florida has adopted a strict rule that the insurer's duty to defend is based solely on the allegations in the complaint. **The allegations in the complaint are controlling even if other testimony indicates that the actual facts are**

**different from those alleged**.

Underwriters at Lloyds London v. STD Enterprises, Inc., 395 F. Supp. 2d 1142, 1145-1146 (Fla. M.D. 2005) (Emphasis supplied in bold) (internal citations omitted) . An insurer's duty to defend exists even if the facts are untrue or the legal theories are unsound. "If the allegations in the complaint create potential coverage under the policy, this is sufficient to trigger the insurer's duty to defend." STD Enterprises, Inc., 395 F. Supp. 2d at 1146. "Doubts as to whether a duty to defend exists are resolved in favor of the insured, and exclusionary clauses in insurance contracts are to be construed liberally in favor of the insured." STD Enterprises, Inc., 395 F. Supp. 2d at 1146. In considering whether an insurer has a duty to defend the Court may not consider testimony or evidence outside of the complaint. STD Enterprises, Inc., 395 F. Supp. 2d at 1145-1146 ("The allegations in the complaint are controlling even if other testimony indicates that the actual facts are different from those alleged"); see also, Jones v. Florida Ins. Guaranty Association, Inc., 908 So.2d 435 (Fla. 2005)( "when the actual facts are inconsistent with the allegations in the complaint the allegations in the complaint control in determining the insurer's duty to defend"). In contrast the duty to indemnify is "determined by the underling facts adduced at trial or developed through discovery." Hayden, 930 So.2d at 691.

## D.    ALEA's Insurable Interest Argument is Without Merit.

ALEA'S motion argues that SEA GARDEN had no insurable interest because the Plaintiffs' in the underlying matters did not experience symptoms until after the December 16, 2005, sale of the hotel to Bray & Gillespie. Specifically, ALEA argues that symptoms of Legionnaires' Disease are experienced between four to ten days after exposure to legionella (See Exhibit "G" to ALEA'S Motion), and that because the plaintiff's were asymptomatic until more than four to ten days after the sale of the hotel "SEA GARDEN's insurable interest in the property ended on December 16, 2005," which was 10, 12, and 11 days prior to what would have to have been the tort plaintiffs'

exposures. (Doc. 86at p. 22). ALEA's arguments on the insurable interest issue are for several reasons erroneous.

First, ALEA misconstrues the legal concept of an insurable interest in a liability policy. Specifically, its arguments relate SEA GARDEN'S insurable interest to SEA GARDEN'S ownership of the hotel. The problem with ALEA's argument is that this case concerns a liability policy, not a property policy, and an insurable interest in a liability policy "does not depend upon the insured's legal or equitable interest in the property, but solely upon whether he or she may be charged at law or in equity with the liability against which the insurance is procured." 3 Couch on Insurance §41:25 (3rd Ed.).

> The nature of the required insurable interest in a liability insurance policy is different from the type of interest necessary to support a property insurance policy; in a property insurance policy, the insurable interest often depends on whether the insured has a legal or equitable interest in the property, **while the rule for liability insurance depends on whether the insured may be charged at law or in equity with liability against which insurance is taken out.** Thus, an insured may obtain liability insurance despite having no financial interest in the property if he or she may be held liable to third persons arising out of the ownership, maintenance or use of the property.

44 Am.Jur.2d Insurance §1004 (2d Ed.) (Emphasis supplied in bold). Thus, if the insured can be charged, i.e. legally sued, at law or in equity for torts committed on or related to the property then it has an insurable interest in the liability policy. See Scottsdale Ins. Co. v. Glick, 240 Va. 283, 287, 397 S.E.2d 105, 107 (Va. 1990).    In this regard, ALEA's heavy reliance upon Section 627.405, Florida Statutes, is misplaced because , in recognition of the above noted legal principle, that statute "has no relevance concerning liability insurance." Aetna Cas. & Sur. Co. v. Growers Properties, No. 58 Ltd., 542 So.2d 1028, 1029 (Fla. 2d DCA 1989). As noted in Growers Properties, it is "completely sensible" for an insurer to sell and an insured to purchase a policy which affords liability coverage to an alienated premises. Growers Properties, 542 So.2d at 1029.

Second, the tort plaintiffs in the underlying lawsuits have filed an expert affidavit which contains an opinion that they could have had legionella exposure during SEA GARDEN'S

ownership.  Specifically, the Affidavit of Dr. Judith Samkoff filed by the plaintiffs in opposition to

SEA GARDEN'S Motions for Summary Judgment in the underlying cases states that:

> [a]lthough most cases of Legionella become symptomatic 2-10 days after exposure, it is well
> known in the epidemiology profession that the incubation period can be much longer than
> that.   Instances of incubation periods of one month are well documented in the
> epidemiologic literature, with one documented case having an incubation period of 2
> months.

(See Affidavits of Dr. Judith Samkoff attached as Composite Exhibit "1").  Dr. Samkoff's affidavits,

further state that even though the Plaintiffs' did not become sick until January that, in her opinion,

"does not in anyway preclude the possibility that [they] acquired the infection before December 16,

2005."  While  SEA GARDEN, as part of its defense of the merits of the underlying lawsuit

disagrees with that statement it is the allegations being made by the tort plaintiffs that define the

scope of ALEA's duties to defend, not whether the claims in the underlying lawsuit are meritorious.

STD Enterprises, Inc., 395 F. Supp. 1142.  Thus, because the allegations being made by the tort

plaintiffs are that they could have had legionella exposure during  SEA GARDEN 'S ownership

summary judgment for ALEA on the insurable interest issue is not appropriate.

Third, the Samkoff affidavits state, as noted, that it is possible that there was exposure during

SEA GARDEN'S ownership of the hotel.  The affidavit of ALEA's expert, Dr. Bush says it was not

possible.  (Doc. 86, Exhibit "G").  This creates a question of fact as to the possibility of the tort

plaintiffs being exposed during SEA GARDEN'S ownership.  Thus, notwithstanding the above

arguments, ALEA's motion falls short on the insurable interest arguments.[2]

## E.   The Absorption/Inhalation/Disease Exclusion Does Not Relieve ALEA of its duties to defend and/or indemnify SEA GARDEN.

ALEA'S reliance on this provision is premised on the assumption that Legionnaire's disease

---

[2]SEA GARDEN'S position in defending the underlying tort claims is that the tort plaintiffs could not have
contracted legionella during SEA GARDEN'S ownership. However, as previously noted, it is the claims being made
against the insured, not the merits of those claims, that create the insurance carrier's duties to defend and indemnify.

can only be acquired by inhalation. (See Exhibit "G" to ALEA'S Motion, Paragraph 23). However, such is not the case. It is widely accepted in the scientific community that Legionnaire's disease can be contracted via inhalation and/or **aspiration**. (See Affidavit of Anita Highsmith attached as Exhibit "2"). Aspiration has been defined as "the sucking in of fluid or foreign substance into the bronchial tubes."[3]  Schmidt's Attorneys' Dictionary of Medicine, Release Number 16 (1983). Moreover, unless the source of the legionella has been positively identified there is no test which can be conducted that would determine whether an individual contracted legionella via inhalation or aspiration. (See Affidavit of Anita Highsmith attached as Exhibit "2"). Thus, assuming for the sake of argument that the plaintiffs in the underlying cases had Legionnaires' disease there is no way to determine how such was contracted (i.e. via inhalation or via aspiration) since all environmental samples at the hotel were negative for the presence of legionella. (See Affidavit of Anita Highsmith attached as Exhibit "2").

Additionally, a review of the Plaintiffs' Amended Complaints and other filings in the underlying tort cases reveals that the Plaintiffs have not specifically contended that they were exposed to and/or contracted Legionnaires' Disease via inhalation. The Amended Complaints and other filings are silent as to the mode of transmission and merely allege exposure to legionella coupled with the subsequent development of Legionnaire's disease.  Consequently, ALEA has a duty to defend the lawsuits and it is premature to make any determinations as to a duty to indemnify at least in so far as this exclusion is concerned. See, Hayden, 930 So.2d at 691.

## F.	The Absolute Pollution Exclusion Does Not Relieve ALEA of its Defense and Indemnity Obligations

ALEA's argument that "the absolute pollution exclusion" bars coverage is based upon the pollution exclusion language contained in the seven page ALEA 01 endorsement. (Doc. 86, p. 3).

---

[3]Absorption has been defined as "the taking in of foodstuffs, medicines, fluids, etc., by the body surfaces." Schmidt's Attorneys' Dictionary of Medicine, Release Number 16 (1983).

ALEA argues that this exclusion is "clear and unambiguous." (Doc. 86, p.12). ALEA'S exclusion is not "clear and unambiguous."

Here, as noted above, the applicable language resides in the ALEA 01 "absolute pollution exclusion" which replaced the pollution exclusion in the ISO Form as well as the definition of pollution in the ISO form. (Note the words "All wording is replaced by the following"). (Doc. 86, Exhibit "A").

## 1.    The ALEA 01 Endorsement Pollution Exclusion is Ambiguous

The essence of ALEA's argument is that the pollution exclusion excludes coverage for pollutants, the term pollutant includes legionella bacteria, ergo no coverage. In support of its argument ALEA cites Deni Associates v. State Farm Fire and Casualty Co., 711 So.2d 1135 (Fla. 1998) and Nova Casualty Co. v. Waserstein, 424 F.Supp.2d 1325 (S.D. Fla. 2006). However, both Deni and Nova are distinguishable in the sense that both involved the form ISO CGL pollution exclusions and definitions, and as previously discussed ALEA struck the form language and replaced it with the pollution exclusion in the ALEA 01 endorsement . This is important because the crux of Deni, Nova, and other Florida cases concerning the pollution exclusion is not that this or that is covered or not covered but rather that the policy language is to be consulted. The rule is not that pollution exclusions automatically exclude a laundry list of items. Rather, the rule is simply read the policy. The reason the exclusions in Deni and  Nova were not held to be limited to "environmental pollution" is because of the specific language of the policies, and because both, concerned the ISO form pollution exclusion which ALEA replaced in its policy. Consequently, we must examine ALEA'S absolute pollution exclusion.

The ALEA exclusion is broken into two subparagraphs (A) and (B). (Doc. 86, Exhibit "A"). Subparagraph ( A) does not even utilize the term pollutant, and ALEA has made no arguments in its motion other than those directed to the definition of the term pollutant. Thus, ALEA simply has

not even attempted to meets its burden of showing that the underlying cases are somehow excluded from coverage byway of subparagraph (A). Therefore, we turn to the language of subparagraph (B).

Subparagraph (B) is further broken into subparts (1) and (2). Subpart one concerns an insured's payment of fines, penalties, etc. in response to governmental directives and private injunctions. Thus it is not at issue. Subpart (2) reads that it excludes "any litigation . . . in which any insured . . . may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of pollutants . . . into or upon land, premises, buildings, the atmosphere, any water course, body water, aquifer or groundwater . . ."

The language of subpart (2) of Subparagraph (B) differs significantly from the language utilized in the ISO CGL form pollution exclusion, i.e. the pollution exclusion discussed in most of the Florida cases. In particular, the ISO CGL form pollution exclusion reads, in pertinent part, as follows:

> f.    Pollution
>   (1)    "Bodily Injury" or "property damage" arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of "pollutants":
>      (a)    At or from any premises, site or location which is or was at any time owned, occupied by, or rented or loaned to, any insured
>            * * *
>      (b)    At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal . . .

While the standard ISO form concerns pollutants released "at or from any premises owned or occupied by . . . any insured" the ALEA exclusion concerns pollutants "into or upon land, premises, buildings, the atmosphere, . . ." The standard form focuses on the genesis of the pollutant, i.e. did it originate at an insured premises, whereas the ALEA 01 language seems to focus on where the pollutant ends up. This creates an ambiguity. Specifically, does the ALEA 01 exclusion, given that it lacks the language "at or from (an insured premises)", exclude from coverage claims on the

insured premises or does it only exclude claims involving "loss, cost, expense, fines and/or penalties arising out of" any litigation involving pollution "into or upon land, premises, buildings, the atmosphere, etc." other than the insured premises? In other words, the ALEA 01 exclusion lacks the traditional "at or from (an insured premises)" language and thus, the way it is written can be read several ways:

(1)    That it excludes only litigation involving an insured because of damage "at or from" an insured premises as the ISO form does, i.e. litigation from pollution outside, and away from the insured premises;

(2)    That it excludes claims outside the premises; or

(3)    That because it lacks the "at or from" language it excludes only litigation concerning losses, costs, fines. etc. concerning damages resulting off and away from the insured premises.

In this regard the terms "land, premises, buildings, the atmosphere, any water course, body water, aquifer, or ground water" are terms seemingly referring to places away from the indoors of an insured premises. See generally, Franz v. City of New Rochelle, 124 N.Y.S.2d 525, 259 (N.Y.Supp. 1953) ("The word premises is an elastic and inclusive term. . . it may mean an entire building with the land under and surrounding the same or it may mean any separately leased or occupied store, office, room or other unit in a building");Board of Regents v. Royal Ins. Co. , 517 N.W.2d 888, 893 (Minn.1994).

In West American Ins. Co. v. Band and Desenberg, 925 F.Supp. 758 (M.D. Fla. 1996), aff'd 138 F.3d 1428 (11th Cir. 1998), per Judge Bucklew, this Court held that the CGL form pollution exclusion excluded indoor sick building cases from coverage. However, as noted, that case concerned the form CGL language of "at or from any premises". There,  Judge Bucklew distinguished cases using language similar to that in the ALEA 01 endorsement. West American, 925 F. Supp. at 725 (internal citations omitted).

West American should be compared to the Minnesota case of Board of Regents v. Royal Ins.

Co., 517 N.W.2d at 893 (Minn. 1994), wherein the Minnesota Supreme Court in looking at language

closer to that utilized in the ALEA 01 endorsement reached a different conclusion stating:

> When the air supply within a building becomes contaminated, it is harmful to the controlled
> environment of that building; but the contamination of the air in a building is not harmful
> to the surrounding natural environment, at least not until it escapes into that environment
> so long as to cause personal injury or property damage- a claim not made here. **We
> conclude, therefore, that the term "atmosphere" in the pollution exclusion does not
> exclude coverage under the primary policies for the contamination or pollution of air
> within a building**.

(Emphasis supplied in bold).

In short, B(2) of the ALEA exclusion unlike the ISO form pollution exclusion, can be read

two ways: 1) that it applies only to claims for pollution outside the insured premises; 2) only claims

for pollution dispursed onto the property of others; or 3) that it covers such cases as well as those

involving pollution within the insured premises. The underlying tort cases concern alleged

legionella exposure inside the insured premises. If the reading g that the policy only covers pollution

outside and/or away from the insured premises is correct the exclusion would not apply.

Consequently, there exists an ambiguity in theALEA 01 absolute pollution exclusion which must

be construed against ALEA.

## 2.   Legionella Should Not Be Considered A Pollutant

In arguing that the "absolute pollution exclusion" excludes the tort plaintiff's claims ALEA

cites Nova Cas. Co. v. Waserstein, 424 F.Supp.2d 1325 (S.D.Fla. 2006) and Deni Assocs. v. State

Farm Fire & Cas., 711 So.2d 1135 (Fla. 1998) to argue that "Florida courts have recently extended

the definition of "pollutant" to include bacteria. In Deni Assocs., the Florida Supreme Court rejected

the argument that pollution exclusions in CGL policies should be limited to environmental damage

type of claims under a reasonable expectations theory. Instead, the Florida Supreme Court held that

it would not adopt the doctrine of reasonable expectations as Florida law, but would instead adhere

to the rule that coverage under an insurance policy is to be considered by reading the language of the

policy itself, and not by the expectations of the parties.  The court then reviewed the pollution exclusion in the State Farm policy and found that nothing in its language limited it to traditional environmental claims.

In Nova, the Southern District of Florida held that the terms "'living organisms,' 'microbial populations,' 'microbial contaminants,' and 'indoor allergens,' fit the ordinary definition of a 'contaminant,' and, as alleged in the (complaints in the state court actions) had a contaminating effect."  424 F.Supp.2d at 1334.  The court thus held that the pollution exclusion excluded from coverage complaints involving those matters.  In reaching that holding the court noted that it was following Florida law that "insurance contracts are construed in accordance with the plain language of the policies as bargained for by the parties."

Florida law is clear that insuring clauses are to be interpreted liberally in favor of coverage. Westmoreland v. Lumbermens Mut. Cas. Co., 704 So.2d 176, 179 (Fla. 4th DCA 1997); see also Fabricant v. Kemper Independence Ins. Co., 474 F.Supp.2d 1328, 1331 (S.D.Fla. 2007).  "In contrast, however, exclusionary clauses in liability insurance policies are always strictly construed." Westmoreland, 704 So.2d at 179.

In Nova,  the court in reaching its holding that bacteria was included in the ISO form pollution exclusion's definition of pollutant relied on the case of Landshire Fast Foods v. Employers Mut. Cas. Co., 269 Wis.2d 775, 676 N.W.2d 528 (2004) in which the "Wisconsin Supreme Court held that losses caused by bacteria were excluded from coverage by the policy's pollution exclusion clause."  Nova, 424 F.Supp.2d at 1334, citing Landshire.  In relying on the Wisconsin case the Southeren District rejected reliance on an Arizona case, Keggi v. Northbrook Property and Casualty Ins. Co., 13 P.3d 785 (Airz. Ct. App. 2000) .  In Keggi, the Arizona Intermediate Appellate Court held that a claim against an insured seeking damages by a person who became ill after drinking water containing total and fecal coliform bacteria was not excluded by the ISO CGL form pollution

exclusion. The Arizona Court stated:

> While the terms 'irritant' and 'contaminant' may be extraordinarily broad, we note that the Northbrook policies limit 'pollutants' to 'irritants' and 'contaminants' that are 'solid, liquid, gaseous or thermal.' The water-borne bacteria alleged to have caused Keggi's injury do not fit neatly within this definition. To the extent that bacteria might be considered 'irritants' or 'contaminants' they are living, organic irritants or contaminants which defy description under the policy as 'solid,' 'liquid,' 'gaseous,' or 'thermal' pollutants.

> We further note that the exclusion delineates the types of contaminants or irritants included with the definition of 'pollutants': 'smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.' Because use of the term 'including' in a definition generally indicates that unlisted items may nevertheless fall within the definition, we conclude that the list is non-exhaustive. However, under the rule of *ejusdem generis*, any unlisted items that are construed to fall within the definition must be similar in nature to the listed items. The enumerated items, namely 'smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste' are primarily inorganic in nature. Bacteria, as living organisms, are not similar to the exclusion's enumerated list.

> \* \* \*

> We conclude that the plain language of the pollution exclusion does not include total and fecal coliform bacteria within the definition of 'pollutants.' Thus the exclusion does not apply to preclude coverage for Keggi's injuries.

Keggi, 13 P.3d at 789-791.

SEA GARDEN respectfully disagrees with the holding of the Southern District in Nova and believes Keggi should be applied. The reason the Southern District rejected Keggi was because Keggi utilized the rule *ejusdem generis* before first finding a word ambiguous. Nova, 424 F. Supp.2d at 1336. The Court then examined a myriad of dictionary definitions to essentially include a bacterium in the same definition of pollution as it would the leak from the Chernybol nuclear plant in the late 1980's.

As long ago observed by one of the Nation's finest Jurist, the Honorable Learned Hand:

> it is one of the surest indexes of a mature and developed jurisprudence not to make a fortress out of the dictionary; but to remember that statutes always have some purpose or object to accomplish, whose sympathetic and imaginative discovery is the surest guide to their meaning.

Cabell v. Markham, 148 F. 2d 737, 739 (2d Cir. 1945). A sentiment echoed by many courts over the years including some closer to home. Hughey v. JMS Development Corporation, 78 F.3d 1523, 1529 (11th Cir. 1996) (citation omitted); Le Credit Lyonnais, S.A. v. Nadd, 741 So. 2d 1165, 1172

(Fla. 5th DCA 1999); Miele v. Prudential-Bache Securities, Inc., 656 So.2d 470, 472 (Fla. 1995). As noted by the Florida Supreme Court, again citing Judge Hand,

> Words often take on a different meaning from their individual definitions when viewed in context with other words in text. As Judge Learned Hand once observed, "the meaning of a sentence may be more than that of separate words, as a melody is more than notes."

In short, the plain meaning of a term is not always derived from the dictionary but can very well be derived from the text it is included in irrespective of whether the exercise bears the label *ejusdem generis* or *expressio unius est exclusio alterius* or something else. What all this means is that the plain meaning of the words solid, irritant and contaminant can be derived from the words around them in the definition of pollutant without utilizing the doctrine of reasonable expectations or running afoul of the rules regarding giving words their ordinary meaning. Thus the plain meaning of irritant and contaminant can be derived in a manner utilized by the Keggi court.[4]

Furthermore, this is buttressed by the fact that the ALEA 01 exclusion's definition of pollutant has added more words than the ISO form contains, further tightening the meaning of the words used in that exclusion.[5]

### 3.   ALEA Has Not Met its Burden of Showing Dispersal of a Pollutant

Furthermore, ALEA, assuming legionella is a pollutant, has not demonstrated how the legionella was released, discharged, etc. nor has it demonstrated into or upon what it was released. As previously noted, ALEA contends that the tort plaintiffs legionella was inhaled. The plaintiff's

---

[4]The ISO Form Definition reads that "Pollutants mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalls, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed."

The definition in the ALEA 01 language reads that "pollutants mean any solid, liquid, gaseous, fuel, lubricant, thermal, acoustic, or magnetic irritant or contaminant, including but not limited to smoke, vapor, soot, fumes, fibers, radition, acid, alkolls, petroleums, chemicals or waste. Waste includes medical waste and all other materials to be disposed of, recycled, stored, reconditioned or reclaimed."

[5]The text of ALEA'S motion quotes the definition of pollutant contained in the ISO form. However, the ALEA 01 pollution exclusion definition should apply. The ALEA 01 language adds "fuel, lubricant, acoustic, and magnetic" which further tightens the context of the definition.

have not to date specified a contention as to how they contracted whatever illnesses they had. SEA GARDEN'S expert has pointed out that it is possible one or all of the plaintiffs, if they had legionella, contracted it through aspiration. If so, then the "pollutant" legionella was not discharged, dispersed, released," etc. as those terms are used in the pollution exclusion.

**4.    The Language of the ALEA 01 Pollution Exclusion shows it is limited to "Traditional Environmental" Claims and is not as expansive as the language in Deni.**

As noted previously, it is the language that makes this case distinguishable from Deni. Under Deni the general ISO CGL form pollution exclusion contained no language indicating it was limited to what is generally thought of as a typical pollution claim. Here, such language is all over the exclusion. For example, paragraph A also seemingly excludes damages "for the devaluation of property, or for taking, use or acquisition or interference with the rights of others in or on property or air space. . ." This language only excluding damages sought against the insured because of another's inability to use his or her own property or air space owing to pollutants.

Subparagraph B of the exclusion likewise supports this. It concerns "any loss, cost, expense, fines and/or penalties arising out of any (1) request, demand, order, governmental authority or directive or that of any private party or citizen action that any insured, or others, test for, monitor, clean up, remove . . . . or in any way respond to or assess same the effects of pollutants, environmental impairments, contaminants, or (2) any litigation . . . in which any insured or others may be involved as a party as a result of actual, alleged or threatened discharge, dispersal, seepage, migration, release, escape or placement of pollutants." In essence, subparagraph B reads that it excludes: (1) cleanups of the insured's property and/or (2) claims involving other's property which concern the movement of pollution off the insured's property.

In short, when drafting its policy ALEA removed the traditional ISO CGL form language, replacing it with the language in the ALEA 01 endorsement, and an examination of the ALEA 01

pollution exclusion shows it to be limited to "traditional environmental claims." To the extent ALEA offers other readings of the ALEA 01 pollution exclusion there would exist an ambiguity which must be construed in favor of coverage. It is certainly true that the Florida courts have uniformly held that the ISO CGL form is unambiguous. Nevertheless, ALEA chose to replace that language with that in the ALEA 01 endorsement which, as noted is simply not as broad as the ISO form language.

**G.     The Sea, Land, and Air Exclusion Does Not Relieve ALEA of Its Contractual Duties to SEA GARDEN.**

In its arguments regarding "the seepage and/or pollution and/or contamination exclusion" ALEA cites Nova and reiterates again its argument that the legionella bacteria is a pollutant. This particular exclusion does not utilize the term pollutant, thus Nova and references to the definition of pollutant shed little light on this exclusion.

SEA GARDEN's research has uncovered few cases dealing with this actual exclusion. In particular, its counsel has found four cases that touch on this exclusion. See Parks Real Estate Purchasing Group v. St. Paul Fire and Marine Ins. Co., 2005 WL 2414771 (S.D.N.Y. 2005), rev'd 472 F.3d 33 (2d Cir. 2006); Indian Harvest Specialtifoods, Inc. v. Westchester Fire Ins. Co., 2005 WL 1925901 (E.D.Cal. 2005); Pepsico, Inc. v. Winterthur Intern. America Ins. Co., 13 A.D.3d 599, 788 N.Y.S.2d 142 (N.Y.App.D. 2004); Montana Rail Link v. Lexington Ins. Co., 175 F.Supp.2d 1248 (D.Mont. 2001). All of these seem to involve property insurance policies and not liability insurance policies. Indeed, the use of terms such as "loss, damage, cost or expense" without the inclusion of terms such as liabilities, expenses, claims or demands further indicates that this exclusion is a property insurance exclusion that has somehow wandered into a liability policy. This is further shown by the use of those terms "loss, damage" in their singular form instead of in their plural. Thus, it is seemingly not applicable to the underlying tort lawsuits. Nevertheless, it is in the

policy so it must be discussed.

Turning to the language of this exclusion it appears that it excludes from coverage only those amounts an insured has already paid out. Since SEA GARDEN has not paid out anything to anyone this exclusion is not applicable.

> A distinction exists between indemnification policies that insure against liability and those that insure against loss: In a liability contract, the insurer agrees to cover liability for damages. If the insured is liable, the insurance company must pay the damages. In an indemnity contract, by contrast, the insurer agrees to reimburse expenses to the insured that the insured is liable to pay and has paid. An indemnity policy covers only the insured's actual expenses. Where a contract indemnifies a party against loss or damage, 'the insured . . . may not bring an action against the insurance company until the insured has actually paid money on his liability.

Marquette Transportation Co., Inc. v. Zurich American Ins. Co., 2006 WL 851399 (E.D.La. March 14, 2006)(internal quotations omitted). This distinction would make since given that in the arena of pollution claims, an environmental spill or similar may require immediate expenditures and remediation efforts by an insured long before the carrier gets involved.

The sum total of the above discussion is this. The seepage exclusion contains terms of a property insurance exclusion and terms that can be fairly read to indicate that it only excludes expenditures already paid. Thus, one reasonable reading of the exclusion is that it excludes from coverage amounts already paid by an insured for property damage. Any other reading would render this exclusion ambiguous.

## V. CONCLUSION

For the foregoing reasons ALEA'S Motion for Summary Judgment should be denied.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was served via electronic filing and U.S. first-class mail this _10ᵗʰ_ day of _August_, 2007 to: **ROBIN E. ROTHMAN, ESQUIRE**, Powers, McNalis, Torres & Teebagy, P.O. Box 21289, West Palm Beach, Florida 33416-1289, **TROY B. FRODERMAN, ESQUIRE**, Bryan Cave LLP, Two North Central Avenue, Suite 2200, Phoenix, Arizona, 85004-4406 and **JOHN P. O'FLANAGAN, ESQUIRE**, P.O. Box 1438, Tampa, Florida 33601; **MARK MATOVINA, ESQUIRE**, Bogin, Munns & Munns, Attorneys for Plaintiffs, 687 Beville Road, Suite A, South Daytona, FL 32119; **JULES ZACHER, ESQUIRE**, Medical Arts Building, 1601 Walnut Street, Suite 707, Philadelphia, PA 19102.

Thomas C. Smith, Esquire
Florida Bar No. 0154652
Ashleigh Jennifer Smith, Esquire
Florida Bar No. 0183385
Hassell, Moorhead and Carroll
149 So. Ridgewood Ave., Suite 301
Post Office Box 2229
Daytona Beach, FL 32115-2229
Phone: (386) 238-1357  /clk
Fax: (386) 258-7406
E-Mail: FBH@Hassell-Legal.com
Trial Counsel for Respondent SEA GARDEN